COMMONWEALTH EX REL. v. E. H. FITLER.

APPEAL BY RELATOR FROM THE COURT OF COMMON PLEAS
NO. 4 OF PHILADELPHIA COUNTY.

Argued January 29, 1890—Decided October 6, 1890.
[To be reported.]

1. The writ of mandamus is not a proper remedy, except when there is
   a clear legal right in the relator, a corresponding duty in the defendant,
   and the want of any other adequate, appropriate and specific remedy:
   Commonwealth v. Pittsburgh, 34 Pa. 496; Lehigh Water Co.'s App.,
   102 Pa. 515.

2. The certification, as a municipal ordinance, of a bill which was vetoed
   by the mayor and failed to pass over his veto, will not be compelled by
   mandamus, on the ground that the veto message was ineffective be-
   cause sent by mistake to the wrong chamber of councils; its validity
   cannot be decided in this summary manner.

3. So far as § 4, act of May 23, 1874, P. L. 231, relating to the govern-
   ment of cities, requires the mayor to return a vetoed ordinance to coun-
   cils within ten days, it is mandatory; but the provision that it shall be
   returned to the branch of councils wherein it originated, is merely di-
   rectory: Per PAXSON, C. J.

4. Under the practice prevailing in the city councils of Philadelphia, it
   seems that a bill introduced into the common councils, referred with-
   out consideration to a joint committee, reported by it to select council
   of which its chairman is a member, and first passed by that body, origi-
   nates therein, within the meaning of said act.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WIL-
LIAMS, McCOLLUM and MITCHELL, JJ.

No. 57 January Term 1890, Sup. Ct.; court below, No. 609
March Term 1889, C. P. No. 4.

On May 11, 1889, upon petition of the Northeastern Rapid
Transit Railway Company, the court below awarded an alter-
native writ of mandamus directed to Edwin H. Fitler, mayor
of the city of Philadelphia, John Eckstein, clerk of the com-
mon council, and Joseph H. Paist, clerk of the select council,
of said city, commanding the defendants forthwith to furnish
to the relator a copy, duly certified in accordance with the pro-
visions of the act of March 21, 1866, P. L. 262, of an ordinance

granting the consent of the city to the construction by the relator of a railway upon certain streets, or, in default thereof, to make known why, etc.

On May 25, 1889, the defendants filed a return, to which the relator on June 1, 1889, demurred, the facts, as admitted by the pleadings, being in substance as follows :

On May 17, 1888, the ordinance in question was introduced into the common council, by being read in place by Mr. Maloney, a member; and thereupon it was referred, without consideration, to the committee on law. That committee was a joint committee, composed of members of each of the two branches of councils, its chairman being a member of the select council. The committee reported it with a favorable recommendation to the select council, and on October 18, 1888, after consideration and amendment, it was passed by that body. It was then sent to the common council, and for the first time received consideration therein. After amendment it was passed and sent back to the select council, which finally passed it, as amended by the common council, on February 7, 1889. The bill was designated in the journal of each chamber as Select Council Bill No. 81. On February 9, 1889, an engrossed and certified copy of it was presented to the mayor by the clerk of the select council. The mayor returned it to select council, with his objections, on February 21, 1889, at the first meeting held after the expiration of ten days from the date of final passage. On the same day, the select council voted upon the question whether the bill should be passed notwithstanding the mayor's objections, and nine votes were cast in favor of its passage and twenty against.

After argument upon the demurrer, the court, WILLSON, J., delivered an opinion in part as follows :

There are many technical questions raised by the demurrer filed by the relator, but it would be profitless to discuss any but the substantial question involved in the case. This arises upon the relator's own statement of its case, as embodied in the petition and writ; and the demurrer, therefore, upon familiar principles of pleading, properly brings it to the consideration of the court. Indeed, the argument of the case included no other subject. . . . . .

Opinion of Court below.

The relator claims that the bill became an ordinance by reason of the fact that the mayor did not send his message of disapproval to the body, where, as it is alleged, the bill originated. The whole ground upon which the relator stands is found in the fourth section of the act of May 23, 1874. That act provided for the three-fold classification of cities, and, among other things, gave somewhat minute directions in regard to the method of municipal legislation. The third section contained requirements relative to the consideration of bills by councils. In the fourth section it was enacted as follows, viz.:

" The mayor shall sign said resolution or ordinance if he approve it, or return the same to the branch of councils wherein such resolution or ordinance originated, within ten days, or at the next meeting of councils after ten days have expired, if he does not approve it, with the reasons therefor; and if thereupon each branch of councils pass the same within five days of such veto, by a vote of three fifths of all the members elected to each branch, it shall become effective as though the mayor had signed the same; it shall equally become effective if he should neglect to return the same within such ten days."

—The court here recited the history of the bill in detail, and then continued:

Under these circumstances, the relator contends that the bill became an ordinance or a law, because, according to the relator's position, it was the duty of the mayor to return the bill, when he disapproved it, with his reasons, to common council, where it is said to have originated, and not to select council, which first considered and passed it. Upon this theory of the case, we are asked to direct the clerks of councils and the mayor to certify to the bill, whose history has just been recited, as an ordinance, in order that the relator may exercise the rights and privileges which would belong to it if the bill actually became an ordinance.

We will not take time to discuss the question raised by the defendants as to whether or not a mandamus could properly be issued to direct such officers to certify to a particular legal result from their acts or omissions. In a clear case; for instance, if the mayor should fail to send his disapproval of a bill submitted to him within the time prescribed by the act of assembly, it might be and probably would be our duty to direct

that the certificate now asked for should be given.   Nothing, however, is better settled, in regard to the writ of mandamus, than that it will not be awarded when the relator's legal right is not clear, in any case:  James v. Commissioners, 13 Pa. 72;  Commonwealth v. Commissioners, 5 R. 75;  Easton v. Water Co., 97 Pa. 554;  Commonwealth v. Councils, 34 Pa. 496 ;  High on Mandamus, *11.

Can it be fairly said that, in this case, the relator has established a clear legal right to assert that the bill in question became operative as a law, and to enjoy the benefits which, if it did, it would have conferred?   If so, we should regard it to be our duty, under our present impressions of what the relator's position would then be, to award the writ of peremptory mandamus.   But we are compelled, by the circumstances which have already been detailed, to hesitate at this point.   No doubt it is true that our municipal legislation and legislative procedure ought to be in substantial accordance with the requirements of the acts of assembly on the subject, and the act of 1874 is now the chart to be followed.   There may, however, be provisions of the act which are merely directory, and, therefore, not so vital as to invalidate what may be done not in absolute conformity therewith.   We do not decide that the statutory provision that the mayor's disapproval of a bill should be returned to the branch of councils in which it originated is of that character.   It is not necessary to decide it, and the question may remain open.   But what would be said, if the mayor should address his message of disapproval to the select and common councils, as we are informed he did in this case, and his messenger, by mistake, or through corrupt inducement, should return the document to the wrong branch, contrary to orders given by the mayor?

In the matter in hand, we are asked, upon a strict construction of the legislative mandate just referred to, to sustain the right of the relator, notwithstanding it must be obvious that, by so doing, we would not only be compelled to hold that the mayor failed of perfecting the intended veto by reason of his inferring, as anybody else would have done, that the bill originated in the branch whose name it bore, viz., select council, but we must also give legal effect as an ordinance to the bill, when the record shows that only one third of the select council

### Opinion of Court below.

supported it, after the mayor's objections were heard.   In other words, by so doing, we would hold the city to an obligation, and, possibly, to a burden, of indefinite continuance and magnitude, when it appears, taking the whole case together, that the final and mature judgment of both branches of the people's representatives never harmonized in the assumption of such a load.   Moreover, any such ruling by us would evidently be contrary to the whole conduct and understanding of councils in the consideration and original passage of the bill in question. Both bodies treated the matter in all their deliberations as a select council measure.

We cannot, therefore, avoid the conviction that we would err, if we should be astute in trying to find a foundation on which to build a structure to sustain the relator's claims.   At the same time, if the true and necessary view of the case requires that all such considerations shall be ignored, notwithstanding the private corporation might gain to the disadvantage of the public, we would, of course, have no right to refuse to extend the arm of the law and afford to the relator the relief which it asks.   Fortunately, we think, in the interest of a sensible and rational administration of the law, we are relieved from any such necessity.

To sustain our conclusion, it would only be essential that it should appear that the relator has not established a clear legal right in the premises.   As previously stated, the mandamus cannot properly be issued, in the absence of such right.   We are prepared, however, to go further than merely to say that the right is doubtful.   In our opinion, the relator has no right, under the bill which the mayor disapproved.

It is true that the original draft of a bill, out of which the final measure was developed, was first introduced into common council.   In a sense, if not within the meaning of the statute, it may, perhaps, be said that the bill "originated" there, because of the mere fact of the introduction of the bill at a meeting of that body, as the first step in its history.   At least, it may be said that, in a certain sense, it originated with the member of that body who offered it.   As previously stated, however, the bill received no consideration in common council; indeed, it could then receive no consideration there, under the provisions of the act of May 23, 1874, but was sent to a committee, which reported it to select council.

At this point arises a difficulty in the way of the relator, which was suggested by the court to counsel at the argument, and which grows no less formidable upon further consideration. If we should take the strict construction of the law which is necessary, in order that the mayor's intended veto shall be held to be of no effect, what would we say as to the effect of the committee's transmitting the bill into select council, instead of into common council, from which it went to the committee? The statute, § 3, directs that "no bill shall be considered unless referred to a committee, and returned therefrom and printed for the use of the members." How can it be said with any propriety, according to the usual significance of language, that the bill was "returned," when it was sent to another branch of councils from that which sent it to the committee? To "return" anything which has been received is, plainly, to hand it over, or deliver the thing, to the person or body from whom it came.

The practice of councils in this regard, if this case affords a sample of it, is well worth serious consideration by those bodies. In this particular case, however, the relator cannot be helped by any habit of councils to deal with bills in such a manner, for it will hardly be contended that these municipal bodies can abrogate a statutory enactment by establishing a contrary custom. We are, therefore, not able to perceive how, if we should adopt the relator's extreme and technical position in interpreting the act in its application to the case in hand, we would avoid finding an insuperable obstacle to its success in the fact that the bill was improperly and illegally reported by the committee to select council, and, consequently, that it never acquired vitality afterwards.

Passing this point, however, it is to be noticed that select council was the first of the two branches to take the bill into consideration, and that the bill was there amended and passed, before common council had really any important connection with the matter. It seems to us that there is no impropriety in regarding that bill which thus came from select council—a different bill, in fact, from that which was introduced into common council—as "originated" in select council, in the ordinary, legislative sense. It certainly cannot be said that the bill went from the common to the select branch, in the first

instance. That could not have been accomplished without its passage by common council, which did not occur until after the select branch had passed it. It was the body which first put its sanction or approval upon the measure by passing it, which can, in the full sense, be said to have originated the bill.

The fact that the bill was treated by both branches as a select council bill, shows that, practically, it was regarded as having been originated in the latter body. Substantially, this was the fact, notwithstanding the peculiarities of the course of legislation give a measure of plausibility to the claim that the origin of the bill was in the other branch. It is with the substance of the matter with which we ought to deal, and we think that, in view of the history of the proceeding before councils, which has been detailed, when the mayor found that the bill submitted to him had been treated by both branches as a select council bill, he was justified in regarding it as having originated in the body to which he sent his message of disapproval, and that, substantially, for all purposes which the statute may be supposed to have been intended, he was right.

It would be a strange anomaly, if, notwithstanding the two municipal bodies were agreed to regard and treat the bill as having come from, or, which is the same thing, as having originated in one of them, a person or corporation, like the relator, should be able to contend with success that their actual, practical dealing with the subject is to be entirely ignored, and that most serious and important privileges, involving, possibly, great injury to private interests, are to be regarded as having been conferred by the city authorities, contrary to the final expressed judgment of one of the legislative bodies, and without any dissent or allegation of usurpation by the other, to which, it is said, the veto message should have been sent.

If the bill had been introduced precisely as it was into the common council on May 17, 1888, and had slumbered in the joint committee, and on the 9th of July, because of the delay, a bill in the same terms had been introduced into the select branch, been referred to the same committee and then back to select council, and had taken the same course subsequently which the bill before us took, it would hardly have been claimed that it originated in common council. The two cases are not precisely parallel, but are they not sufficiently so to illus-

trate the vice and essential weakness of the relator's position in this controversy?

We have thus, with abundant fulness, stated the grounds upon which we rest our conclusion that the relator has failed to make out its case.

. It is hardly necessary to say that we have nothing to do with the question of the expediency of giving to the relator the consent which it asked. That is entirely within the province of the municipal legislature. The question, whether or not that consent was given by the original .passage of the bill referred to, notwithstanding the mayor's efforts to veto it, has, of course, been involved in what we are called upon to decide, although it is not the specific issue before us.

The demurrer is overruled, and judgment will be entered in favor of the defendants.

—Thereupon the relator took this appeal, specifying that the court erred:

1. In entering judgment in favor of the defendants, on the demurrer.

2. In not entering judgment for the relator on the demurrer.

3. In refusing to award a writ of peremptory mandamus.

*Mr. S. S. Hollingsworth* and *Mr. George W. Biddle* (with them *Mr. H. N. Paul, Jr.*, and *Mr. Fred. B. E. Esler*), for the appellant:

1. This bill originated in the common council within the meaning of § 4, act of May 23, 1874, P. L. 231, providing that a bill passed by councils shall become effective as an ordinance unless the mayor, within ten days, shall return it with his objections to the branch of councils in which it originated. The word originate, in parliamentary use, always refers to the first introduction of a bill into a legislative body: May on Parl. Pr., 466, 467; Stephens' Com., 383, 385; Halcombe on Private Bills, 78; Bourinot on Parl. Proc. in Canada, 564, note 5; 3 Hatsell's Prec., 62, 807; May on Parl. Law, 471–479; Wilson's Dig. of Parl. Law, § 435; Cushing's Manual, §§ 2, 203; Jefferson's Manual, 53; Rule 29 of U. S. Senate; Rule 25 of Common Council of Philadelphia; 9 Cong. Deb., 477, 722; Cong. Globe, 3d Sess. 41st Cong., part III., 1717. In some of the state constitutions it has been used as synonymous with intro-

Arguments.

duce: Mich. Const. of 1850, article IV., § 28 ; § 18, article II. of Const. of Tenn.; § 29, article IV., Const. of Mo.; and it has been so used in judicial decisions: Day Land etc. Co. v. State, 68 Tex. 526 ; Opinion of the Justices, 126 Mass. 547 ; Moody v. State, 48 Ala. 115 (17 Am. Rep. 28) ; Jones v. Hutchinson, 43 Ala. 723 ; Hull v. Miller, 4 Neb. 503 ; People v. Devlin, 33 N. Y. 269 (88 Am. Dec. 377).

2. Our own constitution, the constitutions of other states, and the act of May 23, 1874, under which this case arises, all contain the provision that the original purpose of a bill shall not be changed by amendment. It is obvious that the original purpose can only be the purpose of the bill at its origin, and this provision would be defeated if it were held that the bill originates at the time of its first passage in one of the branches of the legislature. It is uniformly held that the original purpose is that which the bill has at its introduction: Stein v. Leeper, 78 Ala. 519 ; Hall v. Steele, 82 Ala. 562. Moreover, in § 11, act of May 23, 1874, the word originate, is plainly used as the equivalent of introduce, and the rule is that the clear meaning of a word in one section of an act will control its meaning, if doubtful, in another. Under the provisions of § 3 of the same act, regulating the reference of bills to committees, and under the joint rules of the councils, which provide that the reading of the title, by a member in place, before any reference, shall constitute the first reading, it is clear that this bill originated in the common council and had started upon its passage, before the select council had anything to do with it. The court below was in error in saying that the councils treated this as a select council bill. The clerk in his minutes does so refer to it, but the councils are not responsible for his language.

3. The object of the provision that the bill must be returned to the branch of councils wherein it originated, is that the objections of the mayor, if inconclusive, may be met and answered in the chamber in which the introducer and champion of the bill has his seat. That provision is mandatory: Opinion of Justices, 3 Mass. 567 ; Harpending v. Haight, 39 Cal. 189 (2 Am. Rep. 432) ; Appendix to N. Y. Laws, 1881, vol. I., p. 943 ; Penna. Globe G. L. Co. v. Scranton, 97 Pa. 538 ; Truesdale v. Rochester, 33 Hun 574. There are two reasons for that rule: (1) that the veto power is in derogation of the sovereign power

Arguments.

of the legislature, and therefore can exist only when express-
ly granted: Burlington v. Dennison, 42 N. J. L. 165; Phila-
delphia v. Given, 60 Pa. 136; Blanchard v. Bissell, 11 Ohio
103; and (2) a grant of authority in a municipal charter must
be followed strictly in the mode of its exercise: Zottman v.
San Francisco, 20 Cal. 96 (81 Am. Dec. 96); Keys v. Denver,
10 Col. 113; Head v. Insurance Co., 2 Cranch 127; Fuller v.
Scranton, 18 W. N. 18; Bloom v. Xenia, 32 Ohio 461; Dan-
ville v. Shelton, 76 Va. 325.    The answer to the suggestion of
the court below, that the veto may have been returned to the
wrong chamber through the mistake or corrupt design of the
messenger, is plain.    It is the mayor's duty to see that his mes-
sage gets to the proper house.    Legislation has often been
interfered with by negligence or wilful design of clerks and mes-
sengers: Jones v. Hutchinson, 43 Ala. 721; State v. Deal, 24
Fla. 293.

4. The validity of the ordinance is not affected by the fail-
ure of the clerk of common council to present it to the mayor
in accordance with the ordinance of May 5, 1855, inasmuch as
this was done by the clerk of the select council.    The mayor
and councils have power to disregard the directions of the or-
dinance of 1855, which is a mere rule of their own: Kilgore v.
Magee, 85 Pa. 401; Commonwealth v. Mayor, 5 W. 155; Speer
v. Plankroad Co., 22 Pa. 376; and, moreover, its provisions
are directory merely: Bladen v. Philadelphia, 60 Pa. 466;
Magee v. Commonwealth, 46 Pa. 358; Pittsburgh v. Coursin,
74 Pa. 400; McGraw v. Whitson, 69 Ia. 348; State v. Mead,
71 Mo. 266.    Nor does the fact that the committee, to whom
the bill was referred by the common council, reported it to se-
lect council, invalidate the ordinance.    It was in fact returned
to the common council, although by an indirect path.    The
rules of the city councils provide that bills shall always be re-
ported to the chamber of which the chairman of the committee
is a member.    One half of the present ordinances would be
invalidated upon the interpretation given to the word return,
by the court below.    While the act of March 21, 1866, P. L.
262, does not expressly make it the duty of the mayor and
clerks to certify ordinances, it impliedly does so by making
certified copies legal evidence.    The court may therefore com-
pel the certification by mandamus: Rex v. Staffordshire, 6 A.
& E. 99.

Arguments.

5. The relator's franchises being dependent upon the consent of the city contained in this ordinance, the ordinance is part of its title, and it needs a certified copy as evidence of the right to exercise the franchises it claims. It has a sufficient interest, therefore, to entitle it to the writ of mandamus: Rex v. Staffordshire, 6 A. & E. 99. The remarks of the court below as to the necessity of establishing a clear legal right, are a correct statement of the law; but what is meant by a clear legal right? This is best answered by a reference to the cases cited by the court in support of the proposition: James v. Commissioners, 13 Pa. 72; Commonwealth v. Commissioners, 5 R. 74; Easton v. Water Co., 97 Pa. 554; Commonwealth v. Councils, 34 Pa. 496. The result of these cases is that when the relator has not brought himself within the terms of the law, or the facts are doubtful, a clear legal right cannot be said to exist, but that when the right depends upon the interpretation of statutes, and they are construed by the court in his favor, a clear legal right is established. The relator's right in this case cannot be doubtful; it is clear or it does not exist, and it is for the court to say which is the case. The argument that the mandamus would compel the mayor to certify to a conclusion of law is fallacious: Queen v. Mayor, L. R. 4. Q. B. 110; Queen v. Price, L. R. 6 Q. B. 411; Queen v. Holl, L. R. 7 Q. B. 575.

*Mr. Robert Alexander*, Assistant City Solicitor, (with him *Mr. Charles F. Warwick*, City Solicitor), for the appellees:

1. In point of fact, as well as in point of law, the mayor made no mistake in returning the bill to the select council. It originated in that body, where it was first considered. There cannot be a legislative origination of that which has not been considered. In all the authorities on parliamentary law cited by the appellants, there is not one case, like the present, where the distinction between the words originate and introduce is made the subject of controversy. Under our peculiar system of municipal legislation they do not mean the same thing.

2. The relator has an adequate remedy without the aid of this writ of mandamus, as, if the city should endeavor to stop the construction of its road by injunction, it can have the validity of the ordinance decided in that suit. The proper remedy

Opinion of the Court.

must be employed for the vindication of legal rights: Sparhawk v. Railway Co., 54 Pa. 401; and a mandamus is not a proper remedy, except where there is a clear legal right, a corresponding duty of the defendant, and the want of any other adequate and appropriate remedy: Commonwealth v. Councils, 34 Pa. 496; Easton v. Lehigh Water Co., 102 Pa. 515.

3. A mandamus cannot be used to obtain the opinion of the court on some doubtful question of law: Schott on Mandamus, 269. Moreover, the act of March 21, 1886, P. L. 262, in regard to certifying copies of ordinances, is not mandatory but permissive; it never was intended to compel the mayor and clerks to certify, in a case like this, to doubtful legal conclusions. According to the relator's own showing, the ordinance did not pass through the regular forms, not having been certified to the mayor by the clerk of common council; and there is no pretence that it was ever published in accordance with § 5, act of May 23, 1874, P. L. 232.

OPINION, MR. CHIEF JUSTICE PAXSON:

The exhaustive and interesting review of parliamentary law with which the learned counsel for the relator have favored us in their paper-book, has failed to convince us that the writ of mandamus prayed for should go out. It is possible that cases may arise in which it would be the duty of the mayor and clerks of councils to certify an ordinance, and that, upon their refusal to do so, the performance of such duty would be properly compelled by mandamus. But in this case we are asked to require them to certify, as an ordinance of the city, an ordinance which the record shows was vetoed by the mayor, and which subsequently failed to pass councils over his veto. We are asked to do this upon the bald technicality, as asserted by the relator, that the mayor by a mistake returned the ordinance, with the veto, to the wrong chamber; that is to say, he returned it to the select council, from which he received it as a select council bill, when he should have returned it to the common council, where the relator alleges it originated. This, it will be seen, raises the serious question whether it is a lawful ordinance; and the mayor and clerks of councils, neither of whom is learned in the law, are required by the relator to practically decide this question, or to do what amounts to the same thing, certify

it as a lawful ordinance, under the provisions of the act of March 21, 1866. We do not think the validity of the alleged ordinance can be decided in this summary manner. The writ of mandamus was not intended for any such purpose. Such writ has never been held to be a proper remedy, except where there is a clear legal right in the relator, and a corresponding duty of the defendant, and the want of any other adequate, appropriate and specific remedy: Commonwealth v. Pittsburgh, 34 Pa. 496 ; Lehigh Water Co.'s App., 102 Pa. 515.

This is sufficient to dispose of the case. We will say, however, in addition, that while it is true that the act of May 23, 1874, requires that the mayor shall sign a resolution or ordinance if he approve of it, or return the same to the branch of councils wherein such resolution or ordinance originated, within ten days, or at the next meeting of councils after ten days have expired, etc., yet we regard it as at least doubtful whether the ordinance in question originated in common council, within the meaning of this act. It is true it was first introduced into the common branch, and then referred to a committee, the chairman of which was a member of the select council. The committee reported it to the select council, which body passed it finally and then sent it to common council as a select council bill. The common council then passed it, and sent it back to the select council, the clerk of which certified it as a select council bill to the mayor, who returned it, with his veto, to that body. While the ordinance was first presented to common council, it does not follow as a conclusion of law that it originated there. In many of the parliamentary authorities and precedents cited by the learned counsel for the relator, the words " presented " and " originated " are used interchangeably, but the difference in manner of procedure between city councils and the parliament of England, the congress of the United States, and the legislatures of most of the states, has been overlooked. In most, if not all, of the last-named bodies, a bill when introduced in one house is never sent to the other, until after it has passed the body in which it was introduced. Hence, we can see why, in such cases, the words have been used interchangeably. But with councils it is different. The committee on law, to which this ordinance was referred, was a joint committee, composed of members of both branches,

and when the committee reported it to the select branch, it became the ordinance of the latter, for all practical purposes. Common council paid no further attention to it, until it had been passed in the upper branch and sent to them. As an ordinance, it may be said to have had no existence, and hence not to have originated in either branch, until some action had been taken upon it.

So far as the act of 1874 requires the mayor to return an ordinance to councils within ten days, it is mandatory, and, by his failure to do so, the ordinance would be as valid as if he had signed it. But the direction to return it to the " branch of councils wherein such resolution or ordinance originated " is merely directory. That is a matter for the convenience of councils, and it is difficult to see how any injury to the public interests could possibly result from an error or oversight of this character. The main matter, the one in which the public are concerned, and the neglect of which might imperil the public interests, is the return of the ordinance to councils within the ten days; all the rest is unimportant detail.

So far from there being any serious irregularity in regard to this ordinance, we are of opinion, under the practice prevailing in councils, the mayor returned it to the proper chamber. The corporation, appellant, has not even the color of right in seeking to override the will of the municipality.

Judgment affirmed.