## Barker v. Bryn Mawr College Trustees et al.

*Private corporations—Colleges—Expulsion of students by faculty—Trial —Right of student to reinstatement by mandamus.*

1. Where a student is wrongfully expelled from a college which is maintained by a private corporation of the first class that obtains all its funds from private benefactions and charges made against those who attend its courses, and receives no pecuniary aid from the State or the public, and the relation between the student and the college is solely contractual in character, the Court of Common Pleas is without jurisdiction to issue a writ of mandamus to compel reinstatement.

2. The law affords other adequate remedy for the wrong done.

3. When the regulations of such a college, and one of the conditions under which the student obtained entrance to it, provide that "the college reserves the right to exclude at any time students whose conduct or academic standing it regards as undesirable," the college is not required, before it excludes a student whose conduct it regards as undesirable, to prefer charges and vouchsafe to her either trial or hearing.

4. The principle of the preceding paragraph is not affected by the fact that before taking action the college afforded the student, who was reasonably suspected of improper conduct, an opportunity for explanation, even though the fact that she had been suspected and invited to explain her conduct became known to other students.

5. To inform the relator that she was suspected of improper conduct, and to invite her to explain it, is not equivalent to charging her with such impropriety.

6. Where, by the plan of government of a college, the actual exercise of the management, care and control of the college affairs has been delegated by the trustees to a board of directors, subject to the supervision and control of the former, and by the plan of government adopted by the board of directors the president, as principal executive, has power to impose the more serious penalties for all non-academic offences, including suspension and expulsion of students without the right of appeal to either board, the court is without power to control the exercise of the president's official discretion.

7. A, who had been a student of Bryn Mawr College, a private corporation maintained by private bequests and gifts, after she had been in attendance about a year and six months, was informed, while away on her Easter vacation, that she should not return. It appears that shortly before leaving college she had been suspected of thefts of small sums of money from fellow-students. The matter had been investigated, *ex parte* by the Dean, and A had, on several occasions, been questioned before fellow-students, who held office under the students' association for self-government, and did not request an opportunity to call witnesses in her favor, although there had never been a formal trial. The matter was then taken up informally for further investigation by the members of the board of directors. The President finally decided that the aforesaid notice should become effective. A then proceeded by mandamus for reinstatement: *Held*, that, under the foregoing principles, a peremptory writ should be refused.

Mandamus. C. P. Montgomery Co., June T., 1921, No. 1.

*Montgomery Evans, Isaac A. Pennypacker* and *George Wharton Pepper*, for relator.                              \

*Larzelere, Wright & Larzelere*, for respondents.

SWARTZ, P. J., and MILLER, J., Feb. 20, 1922.—The relator was excluded from Bryn Mawr College and seeks reinstatement. An alternative writ of mandamus was issued upon petition filed, the respondents made joint answer or return and the latter was then traversed by the relator. It was stipulated that trial by jury should be dispensed with and such issues raised by the pleadings as the court might deem relevant should be tried by it.

After hearing the evidence and arguments of counsel, we, pursuant to the terms of such agreement and in light of the relator's voluntary assumption of the burden of proof, find the facts and draw therefrom the conclusions of law which follow:

Barker *v.* Bryn Mawr College Trustees et al.

*General findings of fact.*

1. "The Trustees of Bryn Mawr College" is a corporation of the first class under Pennsylvania law, chartered by this court and maintaining an institution for the advanced education of women, known as Bryn Mawr College, at Bryn Mawr, in Lower Merion Township, this county, with power to confer degrees. It is a private corporation, deriving its revenues only from the charges which it makes against those who attend its courses, its privately bestowed endowment and other private benefactions. It receives no aid from the State or other public sources. It, of course, enjoys the privilege of exemption from taxation as to all its property that is used exclusively for its chartered purposes.

2. The members of the corporation, known as trustees, have the whole management, care and control of its property and affairs. The actual exercise of much of this power has, by the by-laws and otherwise, been delegated by the trustees to the board of directors of the corporation, subject, however, to the supervision and control of the former. By the plan for the government of the college, duly adopted by the board of directors, the President is the principal executive of the college, with "power to impose the more serious penalties for all non-academic offences, including suspension and expulsion of students." The exercise of this power is not subject to appeal to, or review by, the board, although, as a fact, action, when taken, is reported to it as a matter of courtesy only.

When the result is suspension or expulsion, the President is required to report to the senate the action taken, and, in so far as practicable, the reasons therefor. The senate by a two-thirds vote may then ask for a conference with the board of directors to discuss the principles involved in the action taken.

M. Carey Thomas, the second-named respondent, is now, and for many years has been, President of Bryn Mawr College.

3. The printed catalogue of the college, which is in general circulation and necessary for every student carefully to study, both before and after her admission, has for years contained a provision, or regulation, that "the college reserves the right to exclude at any time students whose conduct or academic standing it regards as undesirable, and in such cases the fees due, or which may have been paid in advance to the college, will not be refunded or remitted in whole or in part."

4. Pembroke is one of the residence halls of the institution, and the relator occupied, after the commencement of the college year of 1920-1921, in the latter part of September, 1920, a single room on the first floor of its west wing. The written contract for the occupancy of this room, which was executed by relator's mother, contained a provision to the effect that, in case of the dismissal of the relator from college, fees would not be remitted.

5. There are at the college two student organizations which are recognized by its management. One is known as the "Students' Association for Self-Government," the membership of which embraces all graduates and under-graduates of the college, and it functions through its "executive force." Its province is to deal more specifically with the conduct of students.

The other is known as the "Under-graduates Association," and its purpose is to foster the social side of student life in college.

Neither had any official connection with the matters hereinafter narrated.

6. The deans of the college are members of its faculty, academic council and senate, which last mentioned body has, for academic offences, sole power to impose the more serious penalties, including suspension and expulsion from

1 D. & C.

college, but is required to report in writing all important actions to the secretary of the board of directors, by which body they are subject to review and determination.

The president is the presiding officer of the faculty, academic council, senate and certain conferences.

In the absence or inability of the president of the college to act as such presiding officer, the dean of the college shall act in her stead, or, in the case of her inability to act, the recording dean shall then do so.

For the last two years, at least, Hilda W. Smith has been the Dean of Bryn Mawr College, and during that time, whenever the President was absent, she has been its "Acting President," while at the same time performing her ordinary duties as Dean. In disciplinary matters, involving non-academic questions, the Dean is the officer most closely in touch with the students, but, before taking action, even in minor cases, she always consults with the President, in whom is vested the ultimate exercise of authority and who alone imposes the more serious penalties in cases of this class.

7. Relevant notable events of the college year of 1920-1921 were the mid-year examinations, which were held in the latter part of January and continued for several days; an athletic meet, held on the afternoon of March 17th, and the Easter vacation, which commenced on March 23rd and ended not later than Monday, April 4th.

8. The relator, whose home is in Michigan City, Indiana, entered the college as a freshman at the beginning of the second semester of the college year of 1919-1920, or about Feb. 1, 1920. She returned in September, 1920, for the college year of 1920-1921, passed successfully the mid-year examinations held in January, 1921, and was thereupon admitted to the Sophomore class. At the time of the happening of the events hereinafter related she was in good academic standing, and her tuition, room rent and all other charges, then due and payable, had been paid in full for the entire college year.

9. Another student, Prue Smith, after September, 1920, occupied a suite, consisting of a study and a bed-room, adjoining the room of the relator, and it was not only not unusual, but, to the contrary, quite customary, for the relator and other students temporarily to make use for study of the apartments of friends, while their own were being tidied up by the maids, were cold or were otherwise not conveniently available for comfortable and undisturbed use. Students do not seem to have been even ordinarily careful in locking the doors of their apartments when they were absent therefrom, or in safeguarding their money and valuables, the favorite keeping-place for which appears to have been the upper drawers of the bureaus in their bed-rooms.

10. While at least some petty theft and pilfering, as distinguished from temporary, unauthorized use of property without the knowledge or consent of the owner, with an intention to return, seems, unfortunately, to have been committed early in the college year of 1920-1921; this annoyance assumed an aggravated form during the mid-year examinations in the latter part of January, and thereafter persistently continued. These thefts were all committed in the morning, between the hours of 9 and 10, when relator and three other students were "free;" that is, not in class or recitation.

Many students sustained loss, and some of the thefts involved substantial sums of money. The relator was amongst the victims. Money in small amounts was thus taken from her room before the mid-years, $11 disappeared during their progress, and, after they were over, her room was occasionally visited during her absence and small sums of money were secretly taken from her purse. She complained to the proper authority, but the money was never

recovered. This undesirable condition caused concern and anxiety and an organized effort was made to discover the thief.

11. Dean Smith testified that Miss Kennard, student head proctor of the hall, had told her that, sometime about March 1st, she had marked a $2 bank note and placed it in a purse in the upper drawer of the bureau in her bedroom. The Dean testified further that Miss Kennard had at the same time given her the serial number of the bill and a description of its secret marking. It disappeared from its hiding-place sometime before 6.15 P. M. of March 17th, the day of the athletic meet, and is said to have been taken after 4.30 P. M. of that day. Miss Barker was in the hall for a short time between the hours named. As hereafter found, this bill was afterwards discovered in her possession.

12. Miss Mearns, another student, while two fellow-students, of whom the relator was one, were present, is said to have placed in a book in her room a large number of postage stamps and then hidden the book. These stamps were afterwards, and before March 23rd, removed by some one during her absence. Miss Barker denied recollection of the occurrence. She was frequently observed in the rooms of other students during their absence.

13. It had long been the policy of the President of the college to impose the severe penalty of expulsion at a time when its object was absent from college on vacation, for the considerate reason that she was thereby afforded the opportunity of making her own explanation of that which appeared to be her voluntary failure to return; March 23rd was the day of departure of all students who were going home to spend the Easter vacation. The relator and others were under suspicion in connection with the thefts mentioned, and nothing had yet been accomplished sufficiently to connect a particular student with them. It was known that Miss Barker had arranged to leave the college in time to take the train west at Bryn Mawr Station at 1.40 P. M. A last effort was, therefore, made on the morning of that day. A $5 bank note was placed on the flat-topped desk in Prue Smith's study, and a Miss Cadot, a senior student, concealed herself in the bed-room closet with its door so arranged that she commanded a view of the money on the desk. The relator was induced to come to the suite. She did so, found the door open, knocked and, receiving no response, entered and found Miss Smith absent. She determined to leave a written communication in connection with the matter which had brought her there, but had no writing materials with her, and her own, in the adjoining room, had been packed in anticipation of her journey. She, therefore, looked around for such material—first on the desk, where she saw none. She then found a scrap of writing paper in the basket alongside it. She next entered the bed-room, opened the upper bureau drawer, took out Miss Smith's purse, or bag, of soft material and felt of it, and, finding no pencil therein, it was replaced and the drawer was closed. She then turned and left the apartments. The money on the desk was not disturbed and nothing was taken from the purse.

We find that the relevant facts already found constituted, in the opinion of Dean Smith, sufficient basis for reasonable suspicion against the relator.

14. The President was absent on business and did not return to the college until March 26th. Soon after relator's visit to Prue Smith's room, she was invited to come to the office of Dean Smith, did so and was there confronted by Miss Cadot and Miss Foote, president of the under-graduate association, in the presence of the Dean. That which transpired at this interview, which lasted eight minutes, was taken down stenographically by a secretary who was in the office. The Dean casually remarked to Miss Barker that money

1 D. & C.

had disappeared during the year, the matter was being investigated and that she and others were under suspicion, and inquired further whether the relator was accustomed to open girls' top bureau drawers and search through them. She stated also that Miss Barker had, without reason for her presence, been seen in rooms of various students who were not her friends, and asked for an explanation. The relator was also asked specifically to explain her visit to Miss Smith's room. She did so by stating that she had been commissioned by its occupant to obtain from the Dean certain information, had finally received it and had gone there to make report, found Miss Smith absent and had, as already found, endeavored to leave a written communication for her, but had been unable to find writing material. She denied seeing the money on the desk. She made no mention of having seen Miss Cadot in the closet, although she now claims having done so as she turned to leave the bureau after closing the drawer. Miss Cadot, who was present and heard the explanation, did not interpose or say that she had been in the room. The relator denied any recollection on the subject of her visits to the rooms of other students, and asked for information specific as to the times, the rooms and the names of their occupants, whereupon the Dean assured her that the information would be obtained and given later to her.

15. Subsequently, at about noon, Miss Barker voluntarily returned to the Dean's office, expressed to that official her anxiety lest her mother should hear about the matter and volunteered assistance, if it were desired, in clearing it up, to all of which the Dean replied that, under the circumstances, since the vacation was about beginning, it would be very difficult to get witnesses and she would have to go into the matter more fully after vacation, when the relator would have an ample opportunity to present her own side.

16. Shortly, in less than a half hour after she had left the Dean's office on this second visit, Miss Barker was publicly called out of class or recitation and instructed to go again to the Dean's office, where, it was stated, she was wanted immediately. She did so, remained eleven minutes, was there again confronted by Miss Foote and also Miss Kennard and a Miss Adair, the business manager of the college, in the presence of the Dean, and all that was said was again taken down stenographically by the same secretary. As the relator entered the office, the Dean informed her that she believed that she had some of the information for which she (Miss Barker) had asked, and thereafter Miss Foote conducted the interview by questioning the relator in relation to her visits to certain rooms, all of which was answered in a way that shows such visits not to have been unusual. She was also asked about her presence in Miss Mearn's room, when the stamps were placed in a book, and replied that she did not remember the occasion. She asked if they did not want her to stay to clear up the matter, and all assured her that such would not be necessary.

No copy of the transcribed notes taken at the first and third interview in the Dean's office was ever shown or furnished to the relator, and while a copy thereof was marked for identification at the trial, it was not offered in evidence.

17. Upon relator's departure after this third visit, she was met in the corridor by Miss Kennard, who asked to see the money that Miss Barker had with her. She at once took out her purse, opened it and showed its contents, which included a $2 bank note. Miss Kennard seized the latter and, upon its examination, claimed it as her own and expressed a desire to retain it. Miss Barker denied such ownership and at first objected to surrendering it, but finally consented upon being given $2 in exchange. Upon being asked by

Miss Kennard where she had obtained the bill, the relator replied that she had received it in change from Miss Bunch, who, that morning, had purchased her ticket. Miss Barker was not aware at this time that any bill had been marked. At once, after the meeting, Miss Kennard delivered a $2 bill to the Dean. It bore the serial number and showed the marking mentioned in our 11th finding. There was no testimony positively to show that the bill taken from Miss Barker was the one delivered to the Dean, but, for the purposes of this case, we feel safe in finding such to have been the fact.

18. The relator then left for the railroad station and, before the departure of her train, made an effort to get Dean Smith on the telephone, but was unable to do so. She left with the person who, in the Dean's absence, had answered the call a message to the effect that, because she was unable to talk to the Dean, she would immediately write to her from the train en route for home. She did so, and the letter stated, in part, that "I wished to correct a statement made to Margaret Kennard about a quarter of one. I said that I had received a $2 bill from Laura Grease Bunch, the balance of a cheque for $50 which I had given her to get my ticket home. I remember now that the change was only $1.31. I placed this in a pocket in which was the $2 bill in question and some other change. The $2 bill and the change I received from a cabman a week ago Sunday (March 13th), when I went to Dr. Branson's office. It was part of the change from a $5 bill which I got from Miss Patterson. My misstatement in regard to where I had gotten the $2 bill was due to placing the two sums in the same pocket. The telephone number of the cab company is 513." Before Miss Barker left the college for home, at least one student, who was not present at any of the three interviews in the Dean's office, had already learned of them.

19. On the same day, March 23rd, the Dean wrote to President Thomas, who was at the time in Boston, a comprehensive report of that which had transpired earlier in the day and enclosed a partial list of the students who had lost money, with the amounts taken; a written statement by Misses Kennard and Foote of the occurrences leading up to the interviews, and a copy of the transcribed stenographic notes of the first and third interviews. After stating that the relator had been the object of suspicion for some time, the letter goes on to say that the matter had been brought to a head that morning, when "I gave her every chance, in the presence of the other students and alone, to explain these suspicious circumstances." It goes on to say that she "denies everything" and "would admit nothing, although she said she was anxious to have the matter cleared up. I did not in any way make a definite charge of stealing, nor did the students. We simply stated various suspicious circumstances and asked her for an explanation." This letter also contains certain observations and recommendations by the Dean concerning the case.

20. On the following day, or March 24th, the Dean, before her own departure on a vacation, wrote again to the President, addressing her at the college. This letter was received on the latter's return from Boston on the morning of the 26th, and merely enclosed certain additional material relating to the case. The testimony throws no light on its identity or character.

21. On March 26th, while at the college and before her departure, later in the day, on another journey, the President, in the absence of the Dean and Miss Kennard, wrote to Marjory C. Barker, the mother of the relator, a letter, with which there was enclosed one of similar import to the daughter, stating somewhat inaccurately the then status of the case, giving reasons why she could not take it up for disposition before April 2nd, and requesting Mrs. Barker not to allow her daughter to return to the college until she (the

1 D. & C.

Barker v. Bryn Mawr College Trustees et al.

mother) had heard again from the writer, who would communicate with her on the latter date, after which, "if you wish to see me, I shall be very glad to see you." The letter of March 26th stated further that "all my information leads me to believe that we shall think it undesirable for her (Miss Barker) to return at all." The enclosed letter of even date to Miss Barker concluded: "In order that there may be no misunderstanding, I should like to repeat that you are not permitted to return to college until you hear from me again." After writing these two letters, President Thomas left Bryn Mawr and did not return until Saturday, April 1st.

22. Both letters of March 26th reached their respective addressees by due course of mail on March 30th, and the mother, after a long talk with her daughter, who was seriously ill at the time, sent, on March 31st, a long despatch to President Thomas, in which she explained her daughter's visits to the room of Prue Smith and other students, and stated that the relator failed even to remember the Louise Mearns stamp incident and claimed herself to have been at different times the victim of the petty stealing in question. It sets forth further that Miss Kennard had promised her daughter an investigation and that the mother expected full restitution, and expressed her own belief that there was no question of her daughter's innocence. The mother had discussed the $2 bill incident with her daughter in the conversation, but did not mention it in the despatch.

Mrs. Barker, in the same day, by telephone or telegraph, appealed to Mr. Richardson, of New York City, a relative; Captain Teale, of West Point, a friend of many years; Mr. Rust, of Pittsburgh, a stranger to her, but who happened to be the father of a friend and classmate of her daughter, and Mrs. Sawyer, of New York City, another old friend of both mother and daughter, for help in her difficulty. Mr. Rust had been appealed to, however, by his own daughter, who seems already to have known of Miss Barker's trouble, no doubt, because she and the latter had been traveling companions from Bryn Mawr to Pittsburgh, on their way to their respective homes, so early as the evening of March 23rd, to interest himself in her case. All responded promptly. Mrs. Sawyer arrived at Bryn Mawr on March 31st, Mr. Rust and Captain Teale on April 1st, and Mr. Richardson on Sunday, April 3rd. Miss Barker also wrote, on March 30th and 31st, concerning the matter to five fellow-students and received replies from all.

23. President Thomas returned to Bryn Mawr on Friday, April 1st. On the following day, she first conferred with Dean Smith and read the transcribed notes of the two interviews of March 23rd in her office, which had been attended by Miss Barker. She then saw and examined at least the Misses Kennard, Foote and Cadot of the students chiefly concerned. She then talked to the secretary of the college and the housekeeper of Pembroke Hall. And she had before her the Dean's letters of the 23rd and 24th, the two enclosures in the former, Miss Barker's letter to the Dean of the 23rd, and Mrs. Barker's despatch of the 31st. Mrs. Sawyer had called to see her, but had been compelled to depart without being able to do so, leaving word, however, that she was anxious to return and confer with the President. Mr. Rust and Captain Teale had been granted brief interviews. The Misses Kirk, the relator's preparatory school teachers, had been seen. But Margery Barker, who had been a student at Bryn Mawr for well over a year and who had never yet had an opportunity to some in contact with its President, who had never seen nor met her and who did not know her, had not been seen.

It was at this stage of the case that President Thomas, without any ill-will or malice, and in the performance of her duty, as she conceived it, after con-

sideration, wrote to Mrs. Barker the letter of April 2nd, in which it was said in part: "After very careful consideration, I have decided that it is my duty to write you that, in my opinion, it is not desirable for your daughter, Margery Barker, to return to Bryn Mawr College, and that she will, therefore, not be readmitted." This letter constituted the "ultimate exercise of authority" by President Thomas under her power "to impose the more serious penalties for all non-academic offences," and operated in the definite and final exclusion of the relator from Bryn Mawr College.

President Thomas testified that her final decision was based on a great many reasons, of which the thefts in Pembroke were only one and not at all decisive.

Unfortunately this letter never reached its destination. Mrs. Barker, of course, anticipated its arrival because of the assurance contained in that of President Thomas to her, dated March 26th. After waiting some time for it, she communicated with the President, whereupon a carbon copy of the letter of April 2nd was mailed to her. It arrived at its destination on April 14th, when Mrs. Barker came at once to Philadelphia. The relator had preceded her by several days.

In later suggesting to Mrs. Sawyer, under the same date, however, that it was unnecessary for her to come again to Bryn Mawr, that lady was informed by President Thomas that "nothing that you could say would alter my decision that it is unwise for Miss Barker to return to the college." Mr. Rust and Captain Teale received from President Thomas personal assurances of similar import.

24. We shall now hasten to the end of our general findings. The relator and her friends were strong in their conviction that a wrong had been done her, and that, notwithstanding the oft-repeated protestation that no charges had been preferred against her by the college, the circumstances, the publicity which they had obtained and their covert insinuations against her character and honor, were, in effect, worse than direct charges; and they were insistent and persistent in their pleas and ultimate demands for fair play and an opportunity to be heard in defence against them. President Thomas continued to declare her open-mindedness and to aver her willingness to reconsider the case, and, if need be, revoke her decision of April 2nd, should its facts suggest the propriety of such action on her part. Many interviews and much correspondence ensued. She saw and heard Mrs. Barker at least twice and the relator as often. She called upon counsel for the latter. Mr. Richardson, Mr. Rust and Mr. Du Pont saw her. As a result, she carefully reconsidered her action at least twice and both times reached the same conclusion. An eminent member of the bar, one of the trustees of Bryn Mawr College, was requested by the directors to investigate the case. He did so, saw many of the parties having knowledge of the circumstances and carefully reviewed it, but did not see Miss Barker, however; Mr. Rust saw and conferred with him on different occasions. This gentleman sustained the conclusion therein of President Thomas.

25. Under the plan of government of the college, the President's action was a finality and not subject to appeal to, or review by, the board of directors. At the instance of the relator and her mother, or, at least, with their full knowledge and consent, Mr. Rust carried the case to the board, however. No objection was made to such being done, although the records of the institution showed no precedent for the action. He interviewed personally thirteen or fourteen of the eighteen directors, and, in anticipation of its regular meeting of May 20th, at the suggestion of Mr. Wing, one of its members, prepared

1 D. & C.

most carefully a printed memorandum of the case. This brief stands out in the evidence as a monument to his disinterested zeal, persistency and loyalty. This tribute is his due when it is remembered that, prior to April —, 1921, he had never met nor seen Mrs. Barker and had met the relator only once, when, for a short time in January of that year, she was a house guest of his own daughter. A copy of this memorandum was enclosed by him in a personal letter to each director some days before the meeting, which was very well attended.

The case was there carefully and thoroughly discussed, when, after consideration, the board decided that it was of the unanimous opinion that the discretion of the President in requesting the withdrawal of Miss Barker from the college had been properly exercised.

26. We find as facts that Miss Kennard, Miss Foote, Miss Cadot, Miss Adair and the private secretary, or stenographer, all of whom were present at one or more of the interviews of March 23rd in the Dean's office, were not offered as witnesses at the trial, and that, as the principal inquiry in the case is directed to whether or not President Thomas, on April 2nd, properly exercised the discretion vested in her, or, as contended by relator, should have first given her further opportunity to be heard, the question of her guilt or innocence is not in issue; wherefore, and for the additional reason that such was expressly agreed upon at the trial, we have carefully avoided making any findings thereon.

### Discussion.

Following our usual practice, we have made comprehensive general findings of fact, so that, in case of review, the decision may be complete and in itself embrace all that may be required. Such findings are, furthermore, supplemented, and to a large extent repeated, by answered requests by relator and respondents for such. An examination of all discloses no serious disagreement between the parties concerning the major facts of the case, which, of course, eliminates necessity in this discussion of either making extended reference to them or reconciling them with the evidence. The real difficulty in this case is, therefore, first to seek to determine from the conflict of authority just what is the law and then to apply it to the facts as they have been thus found.

The question of jurisdiction, being always a preliminary one, to be determined before a case is considered on its merits, and its lack having been raised against the relator by the answer and urged by the respondents ever since, must first engage our attention.

To sustain it, we are referred by her counsel to our own case of Stambaugh v. The Trustees of Bryn Mawr College et al., No. 129, June Term, 1919. It can scarcely be regarded as either precedent or authority, however. In that case, which was one of mandamus, the question of jurisdiction was not passed upon by the court, and, for that matter, the petition was withdrawn and the suit marked discontinued before its issues of fact were tried. They also refer us to the 1st section of the Act of June 8, 1893, P. L. 345, and its amendments of April 28, 1899, P. L. 84, March 19, 1903, P. L. 32, and June 19, 1913, P. L. 526. It seems clear that this section of the act was intended, not to enlarge the right to the writ or to increase the wrongs for which it should be a remedy, but rather to designate the parties against whom the court should have the power to make it run. The classification or number of such parties has been enlarged by each succeeding amendment, but the act was not meant, nor is it to be construed, to substitute mandamus for the writ of summons and the ordinary proceedings and trial: Com. ex rel. v. Philadelphia, 176 Pa. 588, 593; Com. ex rel. v. Barker, 211 Pa. 610. The construction for which relator

contends would make mandamus a remedy even for the collection of a note from any defendant designated by the act. The Act of 1893 and its amendments do not, therefore, in our opinion, confer jurisdiction here, and we are compelled to look elsewhere for a determination of the question.

Originally a high prerogative and extraordinary writ, the right to it and the jurisdiction to issue it have ceased to depend upon the exercise of sovereign will, and it has come to be regarded as an ordinary civil process, issued as of ordinary right in cases where it is applicable: 2 Spelling on Extraordinary Relief, § 1362, citing Com. v. Pittsburgh, 34 Pa. 496. But it will not be issued where the writ would be unavailing (Com. v. Trustees, etc., 6 S. & R. 508; Com. ex rel. v. Susquehanna Coal Co., 1 Lacka. Jurist, 137), as seems to be the case here. The expulsion occurred on April 2, 1921; nearly a year has since elapsed, and in regular course the relator would by now have been in the junior class. The whole situation has changed irrevocably. The clock cannot be turned back. Its only effect would, therefore, be to fix a status, to determine an abstract, academic right.

Moreover, the relator was not a member of respondent corporation. Her relation to it was of a contractual nature. And obligations which rest solely upon contract will not be enforced by mandamus where there is no question of trust or official duty: 18 R. C. L. 129. Duties imposed upon a corporation, not by virtue of express law or by the conditions of its charter, but arising out of contract relations, will not be enforced by mandamus, since the use of the writ is limited to the enforcement of obligations imposed by law: Com. ex rel. Stern v. Wilkes-Barre Gas Co., 2 Kulp, 499; Booker et al. v. Grand Rapids Medical College, 156 Mich. 95; 120 N. W. Repr. 589. It would seem also that relator has other adequate remedies.

But, so far as the question of jurisdiction is concerned, the insurmountable difficulty which lies in the path of the relator arises out of the combination of facts that she was in no sense a member of defendant corporation, but the relation between herself and it was contractual in character, and it is a private corporation, receiving no aid from, and owing no duties to, the public. The earlier authorities on this aspect of the case are in hopeless conflict. See note, 24 A. & E. Anno. Cases, 890.

In Com. ex rel. v. Keim et al., 15 Phila. 1, the petitioners for the writ were members of the defendant railroad corporation, and the subsequent Act of 1893 has settled the question there in controversy that mandamus can issue in the case of a private corporation.

In Com. ex rel. v. Susquehanna Coal Co., 1 Lacka. Jurist, 137, the peremptory writ was refused on the merits of the case, but the court entertained jurisdiction on the ground, inter alia, that the obligation resting on the defendant was in the nature of a public duty. In Com. ex rel. v. McCauley et al., 2 Pa. C. C. Reps. 459, 3 Pa. C. C. Reps. 77, the respondent college had received pecuniary aid from the State, and in all the other reported Pennsylvania cases to which we have been referred, in which the courts entertained jurisdiction by mandamus in suits between students and schools or colleges, the defendant institution was either a part of the public educational system or received aid from the State. So far as we are aware, the exact question presented by the case at bar has not been decided in a reported Pennsylvania case.

Looking elsewhere, therefore, for guidance, it is at once apparent that the conflict of the earlier cases continues, and it would be idle, in this brief discussion, to consider many of the more recent cases. The leading one in favor of jurisdiction is Baltimore University v. Colton, 98 Md. 623, 57 Atl. Repr. 14,

in which a law student, who had been expelled without notice, sought reinstatement. The university was, however, a state institution or at least the law school, of which the relator was by written agreement a member. In fact, the opinion states as a fact that he was a member of the university. Mandamus was there held to be the proper remedy, for the stated reason that want of notice has always been regarded as sufficient ground for invoking the aid of mandamus in cases of membership in corporations organized for the purpose of business or profit, and it is generally held that the same rule also applies to the restoration to membership in a private corporation when no pecuniary interests are involved.

One of the leading cases holding the contrary view is State ex rel. *v.* Milwaukee Medical College, 106 N. W. Repr. 116, in which the relator, who had completed a course in dentistry and claimed to be entitled to a diploma, which was refused, sought by mandamus to compel its issuance by the defendant, which was also a state institution. The Supreme Court, in reversing, held that the case was clearly one of breach of contract, and that duties imposed upon corporations, not by virtue of express law or by the conditions of their charters, but arising out of contract relations, will not be enforced by mandamus. It will not lie to compel a private corporation to perform its contract with an individual. "If mandamus will issue to enforce the performance of the contract between petitioner and appellant, no reason is perceived why it will not lie in any case by a person to enforce a contract with a private corporation."

And another such, and the last we shall mention, is that of Booker et al. *v.* Grand Rapids Medical College, 156 Mich. 95, 120 N. W. Repr. 589—a very well considered case. There the defendant was a strictly private corporation, conducted for private gain. The relators matriculated, attended courses for a year and were refused admission thereafter because they were Negroes. They sought to compel reinstatement by mandamus. In reversing the lower court, which had issued the writ, much that was said by the Supreme Court applies exactly here. The opinion concludes: "If enforcement of the obligations of private corporations by mandamus is to be entered upon by the courts, we know of no rule by which it can be determined in what cases the writ should be refused. The apparent hardship of a particular situation is not a good reason for departing from the rule." A rule made to cover the exigencies of a particular case makes bad law generally: Gorgas *v.* Saxman, 216 Pa. 237.

Without further discussion of this interesting question, we, therefore, hold with the weight of authority that, as stated in 18 R. C. L. 168, "where a student has been wrongfully expelled from a private incorporated institution of learning, mandamus will not lie to compel the corporation to reinstate him," and that we are, in consequence, without power to issue the writ.

Notwithstanding this conclusion, we shall, however, for the reason set forth at the very beginning of this discussion, consider briefly the question in the case which goes to its actual merits. Was the relator wrongfully expelled?

And, before discussing it, we note that the reasonableness of the regulation that the college reserved the right to exclude at any time students whose conduct or academic standing it regarded as undesirable is not before us, because such reasonableness was conceded of record by the relator. Also, that it is settled law that the writ can be issued only to enforce the performance of a ministerial duty and not to control the discretion of the respondents. It can compel the respondents to act, but it cannot interfere with their action, or compel them how to act. Furthermore, the writ never issues in a doubtful

case. Mandamus goes out only where there is a clear legal right in the relator and a corresponding duty upon the defendant: Com. v. Fitler, 136 Pa. 129; Com. ex rel. v. Kessler, 222 Pa. 32.

And its consideration must be approached in light of the circumstances that Bryn Mawr College is not only maintained by a private corporation, but has in residence upwards of 400 students. The witness, the documentary evidence, the whole trial suggested that its atmosphere is high-class, its moral standards are elevated, its purpose is as much to build character as to improve the mind. Protection of its undergraduates against contaminating association or influence is but one of many ways to accomplish this purpose. It was, no doubt, in furtherance of this purpose that the regulation in question was promulgated. Students could be excluded, not when their conduct was undesirable, but when "it regarded" such as undesirable. Neither expressly nor by reasonable implication was the student to be entitled to have charges preferred with an opportunity to answer them or to a hearing.

Did anything occur in this case by which it was made exceptional in this respect? We think not. The positive oral testimony and the documentary evidence both establish that at no time, in the Dean's office or elsewhere, were any charges ever preferred against the relator. She says so herself, and complains only that, when under suspicion, the circumstances of the calls upon her for an explanation raised an inference, or created an innuendo, that "was equivalent to preferring charges against her." An inference must be based upon a fact and not upon its denial. Nor can we subscribe to the conclusion drawn by relator. It may well be that more tact or diplomacy might have been used under the circumstances, and that it was ill-advised publicly to have called her out of class for the third interview, but the purpose of both calls was proper. They showed consideration for her. The college had at the time the absolute right to exclude her if it regarded her conduct as undesirable, and she cannot be heard to complain that, when suspected of improper conduct, she was afforded by the Dean at least two opportunities for explanation.

Moreover, those present at the interviews were properly there. Other than the officials of the college, they were only Miss Kennard, the head proctor of the hall, Miss Foote, the president of the Undergraduates' Association, and Miss Cadot, the senior who had hidden in Miss Smith's room. Their presence was necessary if the investigation was to be fair and complete. The publicity which the matter afterwards obtained is, of course, to be regretted, but it may be that five letters of March 30th and 31st, which the relator wrote to her fellow-students, may have been a helpful factor in this connection. We can find nothing in these interviews, or any of their circumstances, which savored of preferring charges against her, or bound the college, as a matter of law, to give the relator a hearing before subsequent disclipinary action was taken.

It must not be lost sight of that President Thomas testified that her final decision was based on a great many reasons, of which the thefts in Pembroke were only one and not at all decisive. Her letter to Mrs. Barker of April 2nd, and the statement enclosed with it, when carefully read, indicate such to have been the case. As to all these, except the matters involved in the interviews in the Dean's office, it is not contended that, as a matter of legal right, the relator was entitled to be heard. It is not denied that, as to them, the President's power was absolute. We fear that, in light of all the testimony, there is a disposition on the part of the relator to place too much stress upon the relative importance in the case of the subjects which were discussed at those interviews, and to draw a distinction as to them which is not justified.

1 D. & C.

But let us assume, for the moment, that, as it is stated in relator's brief, "the action of the Dean in interrogating the child in the presence of a stenographer and student witnesses was equivalent to preferring charges against her, and, *ipso facto*, bound the college to give her a fair hearing before any disciplinary action was taken against her."

It cannot be reasonably or successfully urged, especially in the absence of any prescribed method of hearing, or form of procedure, that such must be conducted with all the dignity and form incident to a trial in court. The latter are largely prescribed by the Constitution, the statutes and the common law. The authorities of a great educational institution like the defendant college might find much of their time occupied by the trial of such cases if, every time a student were suspected of improper conduct, he was called upon for an explanation and the fact became noised abroad, he would, *ipso facto*, be entitled, as a matter of absolute right, to a formal hearing. The only prudent thing for it to do would be to act without first communicating with him at all.

But, after all, so far as the matters investigated at the interviews in the Dean's office are concerned, did not the relator have a fair hearing in this case both before and after disciplinary action was taken against her?

On the morning of March 23rd she enjoyed three separate opportunities for explanation, of which two were afforded by the respondents. At the first, she knew that Miss Cadot, who was present, had seen her in Prue Smith's apartments. For the reason she assigns, she was not frank enough to inform the Dean of that fact, but, if it is true that she had closed the bureau drawer and turned to leave before she observed Miss Cadot, we must assume that the latter would have told the truth and corroborated her if she had been asked to do so. At the second, but little occurred, but it has not escaped our observation that while the Dean contradicts in the answer relator's recollection of what was said, the former, it may be through an oversight of counsel, was not given an opportunity to do so at the trial.

At the third, all that the relator had to say was heard. At none, did she express a desire either to examine those present, or, then and there, to produce witnesses in her behalf. As to the $2 bill incident, she submitted her explanation in writing, which did not, however, but for the reason that she gave, coincide with her earlier statement to Miss Kennard. Mrs. Sawyer saw and talked in her behalf to the Dean on March 31st. Captain Teale and Mr. Rust, her zealous advocates, conferred with both the President and the Dean. Even her preparatory school teachers called upon the President before the action of April 2nd was taken. The President's letter of March 26th had already told Mrs. Barker that after April 2nd, "if you wish to see me, I shall be very glad to see you." Mr. Richardson called on the President on April 3rd and she heard what he had to say. The relator came about April 9th, and her mother followed in a few days. Counsel was retained on April 12th. Then followed the long series of interviews and conferences with President Thomas, mentioned in our findings of fact, in which all that the relator, her mother, Mr. Rust and Mr. Dupont had to say was listened to patiently. At least twice did the President again go over the entire case.

Mr. White came into it on April 25th. He, too, carefully investigated it and heard Mr. Rust's earnest presentation of it at least twice. And, finally, the board of directors, who received their first impression of the case from Mr. Rust, and had before them his comprehensive and ably prepared memorandum of it, a brief that presented the matter very skillfully and in a light most favorable to the relator, gave it their careful consideration.

It is true that the decision of the President of April 2nd remains unchanged,

but we venture to suggest that it is rarely, if ever, that such a matter receives so thorough consideration, so full and fair a hearing. Not once has the relator, or any one on her behalf, named a witness that she desired to call. There is, of course, no insinuation even that any of the officials of the college was actuated by any improper motives, or influenced by any unworthy considerations. We are unable to see what right, substantial or otherwise, she has been denied. She now demands that which she has already enjoyed.

In our 23rd general finding of fact is to be found a comprehensive statement of all that the President had considered, or had before her, when she took the final action of April 2nd, and all that it is necessary to say, in this connection, is that she thereby exercised the official discretion vested in her; her action is presumed by the law to have been regular, and it is of no interest whatever whether we agree or disagree with her conclusion. In the exercise of that discretion, she was not subject to the control of the court. It has nothing whatever to do with its result, or the mental processes by which it was reached.

It remains only to direct attention to the law bearing on this branch of the case. 11 Corpus Juris, 998, lays down the general principle that a college cannot dismiss a student except on a hearing in accordance with a lawful form of procedure, giving him notice of the charge and an opportunity to hear the testimony against him, to question witnesses, and to rebut the evidence, but a careful study of the principal case cited to support the text shows the defendant institution to have been a state university and indicates that the question of procedure in such cases was not expressly decided. Judge Sadler's charge to the jury in Com. ex rel. v. McCauley et al., 3 Pa. C. C. Reps. 77, does, however, so declare the law; but in that case the defendant was receiving pecuniary aid from the State, which imposed upon it, at least by implication, duties toward its citizens.

To the contrary, in Miller v. Clement, 205 Pa. 484, in which the relator had been expelled from a public school in Philadelphia and sought reinstatement by mandamus, definite charges had been made against him, and the committee of the board, to whom the matter had been referred, held an ex parte hearing, declined to hear witnesses on his behalf and then expelled him. The full board afterwards refused a hearing by it. The peremptory writ was refused. The relator is, therefore, on the merits of the case, also not entitled to a peremptory writ. She was not wrongfully expelled.

From the facts thus found, and for the reasons given, we, therefore, draw the following

### General conclusions of law.

1. Where a student is wrongfully expelled from a college which is maintained by a private corporation of the first class that obtains all its funds from private benefactions and charges made against those who attend its courses and receives no pecuniary aid from the State or the public, and the relation between the student and the college is solely contractual in character, the Court of Common Pleas does not have jurisdiction to issue a writ of mandamus to compel her reinstatement.

2. In such case, the law affords other adequate remedy for the wrong done.

3. When a regulation of such a college, and one of the conditions under which such student obtained entrance to it, provides that "the college reserves the right to exclude at any time students whose conduct or academic standing it regards as undesirable," the college is not required, before it excludes a student whose conduct it regards as undesirable, to prefer charges and vouchsafe to her either trial or hearing.

1 D. & C.

4. Our third conclusion is not affected or changed by the fact that, before taking action, the college afforded the student, who was reasonably suspected of improper conduct, opportunity for explanation, even though the circumstances that she had been suspected and invited to explain her conduct became known to the other students of the institution.

5. To inform the relator that she was suspected of improper conduct and to invite her to explain it, as such was done in this case, without more, did not operate, by either insinuation or innuendo, inference or implication, as a charge that she had been guilty of such impropriety.

6. The court, even if it has jurisdiction, which, in our opinion, is not the case, is, under all the circumstances, without power either to interfere with or control the exercise by President Thomas of the official discretion vested in her, or to strike down or set aside the decision which followed its exercise by her.

7. A peremptory writ of mandamus must be refused and the respondents are entitled to judgment in their favor.

And now, Feb. 20, 1922, it is ordered that this decision be filed in the office of the prothonotary of this court, who shall forthwith give notice thereof to the parties or their attorneys, and that, if no exceptions thereto are filed in said office within thirty days after service of such notice, judgment will be entered thereon in favor of the defendants as provided by law.